Filed 4/14/25  P. v. Ordonez CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ERIK MANUEL ORDONEZ, <br><br> Defendant and Appellant. | F086015 <br><br> (Super. Ct. No. F19902330) <br><br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Timothy A. Kams, Judge.

Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell and Kimberley A. Donohue, Assistant Attorneys General, Eric L. Christoffersen, Sally Espinoza, and Chung Mi Choi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Erik Ordonez (appellant) shot and killed Jose Duran, Jr. A jury convicted appellant of second degree murder (Pen. Code, §§ 187, subd. (a), 189, subd. (b); count 1)[1] with an enhancement for the intentional discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)), two counts of assault with a firearm (§ 245, subd. (a)(2); counts 2 and 3) and being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 4). Following trial, appellant admitted two prior strike convictions. (§§ 667, subd. (d)(1), 1170.12, subd. (b)(1).) The trial court sentenced appellant to 95 years to life in state prison.

On appeal, appellant raises claims of instructional error, prosecutorial misconduct, sentencing error, and ineffective assistance of counsel. We conclude no error occurred and/or any presumed error was harmless. We affirm.

## BACKGROUND

### I.       Testimony of Isabel Duran.

In April 2019, appellant and Isabel Duran (Isabel)[2] had been married for 10 years. They lived together in an apartment with their two daughters, ages eight and 10.

During the last two years of their marriage, appellant and Isabel argued frequently about appellant's alcohol use. Isabel testified appellant would become aggressive when he was drinking and falsely accuse her of infidelity.

On the evening of April 6, 2019, appellant's cousins came over to the apartment. They drank and partied in the living room while Isabel and the daughters stayed in a bedroom. Isabel told appellant she was upset about his drinking, and they argued briefly.

Isabel and the daughters went to sleep around 9:00 p.m. because she had to work early the next morning. When Isabel got up at 3:00 a.m., appellant and his cousins were

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     For clarity, we refer to Isabel Duran by her first name. No disrespect is intended.

still drinking in the living room. They were talking in a manner that made her uncomfortable and scared. Appellant also gave her a certain "look" that he often gave her, but there was something different about it, and it made her feel unsafe. At this point, Isabel decided to leave appellant for good.

Isabel got herself and her daughters ready like she normally did. When she told appellant she was going to work, he responded that she was "going to go fuck somebody else." They argued for 30 to 45 minutes, and Isabel assured him that she was leaving to take their daughters to her father's house and go to work. She did not tell appellant she was planning to leave him.

Isabel drove to the home of her father, Jose Duran, Sr. (Senior),[3] and told him she wanted to end her marriage with appellant. Senior agreed to help her move out of the apartment. She reserved a moving truck, then called her brother, Junior. Junior offered to help her move, and recruited his girlfriend's brother, Buddy Henson, to assist them.

Isabel, Senior, Junior, and Henson arrived at the apartment with the moving truck sometime after 8:00 a.m. Isabel instructed everyone to remain in the living room because she was concerned appellant would start a fight. Appellant knew Junior and Senior, but they were not close.

Isabel testified that when she went into the bedroom to collect her belongings, appellant appeared to be sleeping on the bed. Within five minutes he got up and asked her what she was doing. Isabel told appellant she was leaving him, and he responded that she was not. They started to argue and raise their voices. After about 10 minutes, Senior came to the doorway and told Isabel to be quiet and "just leave." Senior stepped into the room and grabbed Isabel's arm to pull her out, but she resisted. She told Senior that she

---

[3]     For clarity, we refer to Jose Duran, Sr. as "Senior," and Jose Duran, Jr. as "Junior." No disrespect is intended.

3.

was always the one who had to be quiet, but she was going to speak her mind and "fight back this time."

While Isabel was addressing Senior, appellant grabbed her by the arm and told her she was not going to leave. She pushed him away and told him to let her go. They were "kind of hitting each other," but it was more like a struggle. Appellant let go and stepped away from her, moving toward the bedroom window and away from the doorway.

Isabel continued to face appellant, but she turned her head toward Senior, who was still standing in front of the doorway. She continued to tell Senior she was not going to leave. She heard Senior say, "No." She looked toward appellant and saw he was holding a handgun and pointing it at her. She did not see from where the gun came.

Isabel testified she froze when she saw appellant had pointed a gun at her. Appellant was about 10 feet away, and Senior was standing behind her. Appellant did not say anything. No one else was in the room.

Isabel felt Senior pull her back by her shirt, then saw Junior run into the bedroom and jump in front of her. At that moment, appellant fired a single shot, and Junior fell to the floor. Isabel did not see any blood and initially thought Junior had not been hit. Junior immediately stood up and ran out of the room. Senior grabbed Isabel and pulled her out of the bedroom into the hallway. No one made physical contact with appellant after he fired the shot.

Isabel testified she and Senior stumbled as he pulled her into the hallway, and they both fell to the floor. Appellant entered the hallway and pointed the gun at Senior, then at Isabel. He pulled the trigger, but the gun made a "click-click" sound and did not discharge. Appellant's cousin, Felix Ordonez (Felix),[4] grabbed appellant from behind and told him to stop and to leave.

---

[4]     For clarity, we refer to Felix Ordonez as "Felix." No disrespect is intended.

Isabel and Senior started to run out of the apartment but stopped when they found Junior lying on the ground across the threshold of the front door. There was blood coming from under his chin. Appellant stood in the living room for a few minutes with a shocked expression, then ran out of the apartment.

Isabel clarified she did not see Henson when appellant fired the fatal shot. She never saw him go into the bedroom.

On cross-examination, defense counsel asked Isabel if she ever stated during a law enforcement interview, or testified at the preliminary hearing, that appellant pulled the trigger when they were standing in the hallway. Isabel responded she did not remember, noting it had been a long time and she had "tried to block out a lot of things." She then conceded she may not have told the prosecutor, but she believed she told "one of the officers." A detective who interviewed Isabel subsequently testified she told him appellant pointed the gun at her in the hallway, but she did not state he pulled the trigger.

## II. Senior's Preliminary Hearing Testimony.

Senior passed away of natural causes before trial. His preliminary hearing testimony was read into the record in its entirety.

Senior testified that on April 7, 2019, he went to Isabel's apartment to help her move out because she had been having problems with appellant. They rented a truck and went to the apartment with Junior and Henson. When they arrived, appellant was lying on his bed, and his nephew and cousin were asleep in another bedroom.

Isabel went into the room where appellant was sleeping and started collecting her things while Junior and Henson moved furniture out of the apartment. Senior heard appellant and Isabel begin to argue loudly. They were speaking English so he could not understand what they were saying. He stood in the doorway to the bedroom and watched them.

5.

Senior testified that after 10 to 15 minutes, appellant retrieved a gun from beneath his pillow, cocked it, and pointed it at Isabel and him. Senior was standing next to Isabel, and appellant was about six feet away. Junior came running into the room and stood in front of Isabel and Senior. Appellant fired the gun and shot Junior. Senior tried to grab the gun from appellant, but appellant pointed the gun at Isabel and him again. Appellant then grabbed his jacket and left the house with the gun.

Senior went to Junior and saw he was bleeding from the neck. He cried out for someone to call for help, and the neighbors called the police.

## III.    Henson's Recorded Statement.

Henson testified he did not recall the shooting, claiming he had suffered a head injury and could not remember anything. He acknowledged that Junior was his sister's boyfriend, and remembered helping him move furniture, but could not recollect any other details. He claimed he did not remember speaking to the police.

A detective testified he interviewed Henson on the night of the shooting. An audio recording of the interview was admitted into evidence and played for the jury.

Henson stated Junior asked him to help move his sister's belongings out of her apartment because she was not getting along with appellant. When they arrived at the apartment, Junior told Henson that Senior had a bat in his truck, and explained he told Senior he did not have to worry because they were only there to collect Isabel's belongings. Henson expressed concern about getting involved in Isabel's relationship with appellant, and Junior responded not to worry because appellant is a "small guy" and does not "talk to people like that."

Junior and Henson went into the apartment and started moving furniture onto the truck. While they were carrying a couch out of the apartment, Henson heard appellant and Isabel arguing in the bedroom. The argument became louder, and Henson heard thumping sounds and items falling over, leading him to believe it was becoming physical.

6.

Henson told Junior to go check on Isabel. Junior went into the bedroom, then said, "[W]hat the fuck?" Henson heard thumping sounds and believed "they were fighting and tussling." He moved toward the bedroom. Immediately after he reached the doorway and "glance[d]" inside, he heard a gunshot. Junior was only in the bedroom for 15 to 30 seconds before the shot was fired.

Henson stated that when he glanced into the bedroom the moment before the gunshot, he saw Isabel, Junior, and appellant. He believed Senior was also in the bedroom but could not see him "because of all the commotion." Appellant had a gun, and everyone else was screaming, "No." Henson stated that "they were all grabbing each other" and were "all trying to grab the gun." Junior was in front of appellant and was reaching for the gun. Henson described their interaction as "tussling." However, Henson specified he did not actually see Junior grab appellant. He also clarified he saw Isabel near appellant but did not "know if she was trying to grab him too." Appellant was the only person with a weapon.

After the shooting, Junior ran out of the bedroom, and Henson followed him. Appellant was the next person to come out of the bedroom. Henson saw appellant exit the apartment and put the gun in his pants. Appellant ran toward the street and Henson chased him. When appellant reached the middle of the street, he took out the gun and attempted to point it at Henson but dropped it in the process. According to Henson, appellant looked panicked and "out of it," like he was on drugs. Appellant picked up the gun, ran off, and jumped over a brick wall. The police arrived at the apartment moments later.

## IV.    Additional Prosecution Evidence.

Appellant was arrested later that morning. Officers located him hiding in a shed in the backyard of a residence less than a mile from the apartment. The firearm was never recovered.

7.

The parties stipulated to the results of Junior's autopsy. The cause of death was determined to be a single gunshot wound that entered through the lower part of the chin and exited near the backside of the left shoulder blade.

The parties also stipulated appellant suffered a prior felony conviction and was prohibited from possessing a firearm pursuant to section 29800, subdivision (a)(1).

## V. Defense Evidence.

Felix, appellant's cousin, testified he went to the apartment the night before the shooting. He stayed overnight and slept in the living room. The next morning, he saw two people taking items out of the apartment. Sometime later, he heard a gunshot, then saw someone come out of the bedroom and fall on the floor. He did not see what happened in the bedroom.

Appellant testified he was married to Isabel for 10 years. He was not close with Senior and Junior but had never had any problems with them. He also lived with Junior at one point. Appellant admitted he was convicted of robbery in 2006.

Appellant started drinking at the apartment around 4:00 p.m. the night before the shooting. He stayed up drinking with his cousin Felix and his nephew until the sun came up the next morning. He did not recall arguing with Isabel about his drinking and could not remember if he saw her before he went to sleep.

Appellant awoke the next morning to Isabel opening dresser drawers in the bedroom. He asked her what she was doing, and she told him she wanted a divorce and was tired of his drinking. Appellant was surprised by this and did not know why Isabel wanted to leave him. He felt "hurt" but did not become angry.

Appellant testified Senior was also in the bedroom. While appellant was still lying in bed and talking to Isabel about her leaving, Senior approached the foot of the bed and started yelling and cursing at him in Spanish. Based on his "hostile" and "violent"

8.

demeanor, he thought Senior was going to "pounce" on him. However, Senior did not touch or threaten him.

Appellant testified he got out of his bed and grabbed his pistol from underneath his mattress. He knew he was prohibited from owning a firearm but kept it for protection because he lived in a "bad area." He held the firearm at his side, and did not point it at anyone. He told Isabel and Senior to leave the apartment, and they backed into the hallway. Senior continued to curse at him, and Isabel said she wanted "to get all her shit." Appellant looked down the hall and saw Junior and Henson in the living room. He did not know Henson and did not recognize Junior at first. He asked Isabel who she brought into the apartment, but she did not respond.

Appellant stepped back into the bedroom, and Junior and Senior followed. Henson entered soon after. Junior asked appellant, "[W]hat the fuck are you doing?" Appellant responded that he did not want any problems and told them to leave. He was still holding the gun down by his side.

Appellant testified he started to panic because he did not know "what these people are capable of." Senior continued to curse at him in Spanish, and Junior told him, "[I]f you have any problems with my family you can deal with me." Henson then told Junior, "He ain't going to do nothing with that gun. Get him."

Junior "rushe[d]" at appellant and tried to take the gun from him. They wrestled for control of the gun, but did not throw any punches. Appellant testified he was in fear for his life, and believed Junior would kill him if he took the gun from him. He noted Junior was six inches taller and about 25 pounds heavier.

The struggle over the gun lasted "a matter of seconds." Appellant "gain[ed] some strength," pushed Junior off and shot him. Junior was about three to four feet away when he pulled the trigger. Appellant claimed he did not intend to shoot Junior and "just took a wild shot." However, he testified he believed it was necessary to shoot Junior to protect

himself and he had no other choice. Appellant did not see Isabel in the room when he fired fatal the shot, and he did not remember where Senior and Henson were standing.

After the shooting, Junior fell to the ground, and Senior rushed at appellant and tried to take the gun. Felix entered the room, immediately grabbed Senior from behind, and pulled him off appellant. Appellant put the gun in his pants and ran outside. He did not recall encountering Isabel and Senior in the hallway. He saw Junior lying in the doorway and jumped over him. He noticed someone chasing him, so he jumped over some fences and went into a shed. He did not remember what he did with the gun but denied purposely hiding it.

## DISCUSSION

**I.     The Trial Court Did Not Err by Instructing with CALCRIM No. 3472 in Response to the Jury's Question.**

In response to a jury note requesting clarification on imperfect self-defense, the trial court instructed the jury with CALCRIM No. 3472 (Right to Self-Defense: May Not Be Contrived). Appellant contends this instruction was not supported by the evidence and erroneously suggested appellant forfeited his right to self-defense by brandishing a firearm. Alternatively, he argues the trial court should have given the optional language from CALCRIM No. 3472 specifying that a defendant who uses only nondeadly force retains the right to self-defense if the victim responds with deadly force. We conclude the jury was properly instructed, and any presumed error was harmless.

### A.     *Background.*

The jury was instructed on imperfect self-defense with CALCRIM No. 571. During deliberations, the jury sent a note requesting "clarification on imperfect self-defense – PC 192." The note read as follows:

> "Does a person attempting to remove a firearm from another person, and
> that person in possession of the firearm eliminate Imperfect Self Defense as
> the person attempting to take the firearm is doing so due to the other person

having it in possession? 'The person with the firearm originally has created the circumstances that justifies adversary's use of force.' "

The trial court and counsel conferred off the record and formulated the following response, which was sent to the jury:

> "Imperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force.
>
> "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force.
>
> "Apply these instructions to the facts as you find them."

The response was a combination of two instructions. The first sentence was drawn from CALCRIM No. 571, which had already been given to the jury. The second sentence was drawn from CALCRIM No. 3472, which was not given when the trial court initially instructed the jury.

Defense counsel confirmed on the record that appellant had no objection to the response as written. The court also asked appellant directly if he agreed to the response, and appellant answered, "Yes."

## B.    *Standard of review.*

In a criminal case, a trial court must instruct on the general principles of law relevant to the issues raised by the evidence. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189.) Instruction is required for those legal principles " 'closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citations.]" (*Ibid.*) Conversely, "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case. [Citation.]" (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

Substantial evidence must exist for a trial court to provide a particular jury instruction. (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.) In this context, substantial

11.

evidence "would allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof.  [Citation.]"  (*Ibid.*)  In other words, "[s]ubstantial evidence is evidence sufficient to 'deserve consideration by the jury.' "  (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.)

Section 1138 requires a trial court to provide information to a deliberating jury upon request regarding "any point of law arising in the case."  "Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.  [Citation.]"  (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)  However, if the trial court elects to respond by giving supplemental jury instructions, the correctness of those instructions presents a question of law, which we review de novo.  (*People v. Franklin* (2018) 21 Cal.App.5th 881, 887, fn. 4; see *People v. Posey* (2004) 32 Cal.4th 193, 217–218; *People v. Cole*, *supra*, 33 Cal.4th at p. 1210.)

"When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.  [Citation.]"  (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.)  We presume jurors are intelligent persons capable of understanding and correlating all instructions given.  (*People v. Gonzales* (2011) 51 Cal.4th 894, 940; *People v. O'Malley* (2016) 62 Cal.4th 944, 991.)  "We interpret the instructions so as to support the judgment if they are reasonably susceptible to such interpretation, and we presume jurors can understand and correlate all instructions given.  [Citation.]"  (*People v. Vang* (2009) 171 Cal.App.4th 1120, 1129.)

C.      *We decline to find forfeiture.*

As a threshold matter, respondent contends appellant forfeited the instant instructional error claim by failing to object below.  Appellant argues the alleged error is

not subject to forfeiture because it pertains to the People's burden of proof and the trial court's sua sponte duty to provide correct statements of law.

We decline to find forfeiture. Although defense counsel did not object to the challenged portion of CALCRIM No. 3472, section 1259 permits the appellate court to "review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." Appellant argues the instructions were so misleading they prevented the jury from properly considering his self-defense claim, effectively lowering the People's burden of proof. If the instant claim was meritorious, the alleged instructional error would have affected his substantial rights. Therefore, the instant claim is cognizable on appeal despite appellant's failure to object below.[5] (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 503 ["Instructions regarding the elements of the crime affect the substantial rights of the defendant, thus requiring no objection for appellate review"]; *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7; *People v. Smithey* (1999) 20 Cal.4th 936, 976–977, fn. 7.)

**D. *Instructional error did not occur.***

**1. CALCRIM No. 3472 was supported by substantial evidence.**

We conclude the record supported CALCRIM No. 3472 as given. The evidence showed appellant brandished a firearm during an argument with his ex-wife inside of their apartment. The argument was undoubtedly tense and emotional, but there was no threat of violence until appellant introduced a firearm. At most, the argument involved yelling and cursing, and according to Isabel, a minor physical struggle when appellant grabbed her by the arm and told her she was not going to leave. Once appellant drew the firearm, Junior entered the room and positioned himself between appellant and his family.

---

[5] For similar reasons, we do not find appellant forfeited the other instructional error claims raised in this appeal.

According to Henson and appellant, Junior attempted to grab the firearm before he was shot.

Under these circumstances, the jury could have reasonably found appellant provoked a fight or quarrel to create an excuse to use force by escalating a verbal argument into a potentially deadly conflict. When appellant drew his firearm, there was no evidence he was in imminent danger of suffering bodily injury. In this context, his act of drawing the firearm was a brandishing, which inherently conveys an implicit threat to use deadly force. (See § 417, subd. (a)(2) [defining brandishing as drawing or exhibiting a firearm in a rude, angry, or threatening manner, or using a firearm in any fight or quarrel].) This threat was particularly acute because appellant drew the firearm during a domestic dispute. Because Isabel had just told appellant she wanted a divorce, there was reason to believe he might be angry or irrational. Junior reacted by going into the bedroom and attempting to either shield his family from the firearm or forcefully disarm appellant. Therefore, the jury could have reasonably concluded appellant's self-defense claim was contrived because he unjustifiably escalated the argument by brandishing his firearm and used Junior's reaction as an excuse to use deadly force.

Appellant argues the evidence overwhelmingly established that Isabel and her "clan" were the aggressors, and thus, there was no evidence appellant provoked the fight or quarrel that led to the need for self-defense. But even according to appellant's own testimony, he drew his firearm in response to Senior, his father-in-law, yelling and cursing as his ex-wife was packing to move out. Senior was unarmed. He did not touch or threaten appellant, and they never had problems in the past. Appellant responded to Senior by escalating the conflict from angry words to the threat of deadly force. This sudden escalation caused Junior to intervene, which according to appellant led to the shooting. Accordingly, CALCRIM No. 3472 was supported by substantial evidence, and this claim lacks merit.

14.

## 2. The trial court was not obligated to instruct with the optional language from CALCRIM No. 3472.

Appellant contends that even if CALCRIM No. 3472 was supported by substantial evidence, the trial court erred by failing to give the following optional language from the instruction:

> "However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting."

This optional language was added to CALCRIM No. 3472 in September 2022 in accordance with the holding in *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*). (See Bench Notes to CALCRIM No. 3472.) Based on *Ramirez*, appellant contends instruction with CALCRIM No. 3472, or the exclusion of the optional language, misled the jury by suggesting appellant forfeited his right to self-defense if he only provoked a nondeadly quarrel.

We are not persuaded. In *Ramirez*, the defendants sought out rival gang members for a fight. (*Ramirez*, *supra*, 233 Cal.App.4th at p. 944.) One of the defendants, Armando, brought a firearm in his sweatshirt pocket, but "did not set out intending to shoot anyone." (*Ibid.*) After the defendants located and confronted the rival gang members, a fistfight broke out. (*Ibid.*) During the fight, Armando saw one of the rival gang members raise his hand holding an object that looked like a firearm. (*Id.* at p. 945.) In response, Armando pulled his own firearm from his sweatshirt and fatally shot the rival gang member. (*Ibid.*)

The trial court instructed the jury with CALCRIM No. 3472, which did not include the above optional language. (*Ramirez*, *supra*, 233 Cal.App.4th at pp. 945–946.) In closing argument, the prosecutor argued CALCRIM No. 3472, as given, precluded any claim of self-defense even if the defendants only intended to instigate a fight involving nondeadly force. (*Ramirez*, at pp. 945–946.) On appeal, *Ramirez* held that, given the

15.

evidence at trial, CALCRIM No. 3472, in conjunction with the prosecutor's argument, deprived the defendants of their self-defense theory. (*Ramirez*, at pp. 947–948.) It reasoned that if the defendants intended to start a nonlethal fight, they did not lose the right to defend themselves when the victims responded with deadly force. (*Ibid.*) Thus, *Ramirez* held that under the circumstances, CALCRIM No. 3472 "erroneously required the jury to conclude that in contriving to use force, even to provoke only a fistfight, defendants entirely forfeited any right to self-defense." (*Ramirez*, at p. 953.)

The optional language in CALCRIM No. 3472 remedies the instructional issue implicated by the unique factual circumstances in *Ramirez*. For this reason, it only applies to the "rare case in which a defendant intended to provoke only a nondeadly confrontation and the victim responds with deadly force." (*People v. Eulian* (2016) 247 Cal.App.4th 1324, 1334.)

Here, there is no reason to believe CALCRIM No. 3427 misled the jury because there was no evidence appellant intended to provoke a nondeadly confrontation. Unlike in *Ramirez*, appellant never attempted to instigate a fistfight. According to his own testimony, he responded to Senior's angry words by drawing his firearm, a clear threat to use deadly force. Thus, it is irrelevant whether the jury was instructed regarding appellant's right to use deadly force in self-defense after provoking a nonlethal fight, because there was no evidence supporting this theory at trial. Therefore, the trial court was not obligated to give the optional language, and instructional error did not occur.

### E. *Any presumed error was harmless.*

Even assuming the trial court erred in instructing the jury with CALCRIM No. 3472, the alleged error was not prejudicial. Depending upon the basis of the claimed error, instructional error is reviewed under either *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) or *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). Under the more stringent *Chapman* standard, which applies to errors of constitutional dimension,

16.

reversal is required unless the reviewing court can conclude beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman*, at p. 24.) Under the alternative *Watson* standard, which applies to errors of state law, reversal is not required unless it is reasonably probable the defendant would have obtained a more favorable result had the error not occurred. (*Watson*, at p. 836.)

We need not decide whether the *Chapman* or *Watson* standard for prejudicial error applies here because the error was harmless under either standard. As we explained above, the record conclusively established appellant did not provoke a nondeadly quarrel. By brandishing a firearm during a domestic dispute, appellant conveyed an implicit threat to use that firearm, escalating a verbal argument into a potentially deadly confrontation. Appellant's right to self-defense after using nondeadly force was not at issue. Accordingly, even if CALCRIM No. 3472 was erroneously given, it could not have contributed to the jury's determination that appellant did not act in self-defense.

Appellant claims the error was particularly prejudicial because CALCRIM No. 3472 was given in response to a juror question about whether appellant's possession of a firearm was relevant to imperfect self-defense. He argues the trial court's response misled the jury by implying appellant forfeited his right to self-defense by brandishing a firearm, regardless of the surrounding circumstances. He also contends the prosecutor's argument that appellant "didn't have a right to bring that gun out" compounded the purported error.

We disagree. The trial court did not suggest the jury make a specific factual finding or ignore any relevant evidence. It did not imply that the act of brandishing the firearm was "wrongful conduct" that "provoke[d] a fight or quarrel." Rather, the trial court instructed on legal principles applicable to the jury's question about the significance of appellant's display of a firearm, specifying that the jurors must apply the instructions "to the facts as [they] find them." In the absence of contrary indication, we presume the

17.

jury understood and followed these instructions. (*People v. Fauber* (1992) 2 Cal.4th 792, 823; *People v. Thornton* (2007) 41 Cal.4th 391, 441.)

Because there is no basis to conclude CALCRIM No. 3427, as given, misled the jury, the verdict rendered in this trial was surely unattributable to the purported error. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.) We therefore conclude beyond a reasonable doubt that the alleged instructional error did not contribute to the verdict, and this claim lacks merit. (See *Chapman, supra*, 386 U.S. at p. 24.) Likewise, it is not reasonably probable that the verdicts would have been more favorable to appellant absent the purported error. (See *Watson, supra,* 46 Cal.2d at p. 836.) Any presumed error was harmless.

## II. The Trial Court's Instruction on Transferred Intent (CALCRIM No. 562) Was Not Misleading.

Appellant contends the trial court's instruction on transferred intent (CALCRIM No. 562) was incomplete and misleading because it did not specify appellant's mental state also transferred to his unintended target. Specifically, he claims the instruction erroneously suggested that if he intended to kill Isabel but accidentally killed Junior, he is guilty of murder regardless of whether he acted in the heat of passion or imperfect self-defense. We conclude the jury was properly instructed.

### A. *Background.*

The trial court's instruction on the doctrine of transferred intent read, in pertinent part:

> "If the defendant intended to kill one person, but by mistake or accident killed someone else instead, then the crime, if any, is the same as if the intended person had been killed." (See CALCRIM No. 562.)

Appellant did not object to the instruction or request a modification.

18.

**B.** *The jury was properly instructed.*

"[T]he doctrine of transferred intent applies when the defendant intends to kill one person but mistakenly kills another." (*People v. Bland* (2002) 28 Cal.4th 313, 317.) In this circumstance, "the law transfers the felonious intent from the object of the assault to the actual victim…. '[T]he crime is exactly what it would have been if the person against whom the intent to kill was directed had been in fact killed.' " (*People v. Clayton* (1967) 248 Cal.App.2d 345, 349–350.) Thus, a defendant "who premeditates a killing but kills the wrong person is guilty of a premeditated, not just intentional, murder. [Citation.]" (*People v. Bland,* at p. 319, fn. 1.) Similarly, "a defendant is guilty of no crime if his legitimate act in self-defense results in the inadvertent death of an innocent bystander." (*People v. Levitt* (1984) 156 Cal.App.3d 500, 507, disapproved of on another ground by *People v. Johnson* (2016) 62 Cal.4th 600, 649, fn. 6.) Transferred intent also applies to voluntary manslaughter. (See *People v. Carlson* (1974) 37 Cal.App.3d 349, 355.)

In accordance with these principles, the trial court specified in CALCRIM No. 562 that if appellant intended to kill one person but accidentally killed another, "the crime, if any, is the same as if the intended person had been killed." Additionally, in CALCRIM No. 570 and CALCRIM No. 571, the trial court instructed that "[a] killing that would otherwise be murder is reduced to voluntary manslaughter" if appellant killed "because of a sudden quarrel or in the heat of passion" or "in imperfect self-defense."

Considered together, these instructions clearly communicated that if the jury found appellant intended to kill Isabel but accidentally killed Junior, he is guilty of voluntary manslaughter if he acted in the heat of passion or imperfect self-defense. (See *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 791 [we presume jurors are able to integrate all instructions given].) Nothing in the instructions suggested the jury should disregard appellant's mental state if it found Junior was not his intended target.

19.

Accordingly, appellant has not demonstrated a reasonable likelihood that the jury understood the instructions in the way he asserts, and this claim is without merit.[6]

III.   **Appellant Was Not Prejudiced by the Trial Court's Failure to Instruct with CALCRIM No. 3470 (Right to Self-Defense or Defense of Another (Non-Homicide)).**

Appellant claims the trial court erroneously failed to instruct the jury on self-defense on counts 2 and 3, the assault with a firearm charges as to Isabel and Senior. (See CALCRIM No. 3470.)  He argues the error was prejudicial because it allowed the jury to convict him of the assault counts even if they believed he acted in lawful self-defense.  We need not determine whether the self-defense instruction was supported by substantial evidence because any presumed error was harmless.

A.   *Background.*

The trial court instructed the jury on perfect self-defense with CALCRIM No. 505. This instruction defined perfect self-defense as it pertains to homicide, specifying appellant is "not guilty of murder or manslaughter if he was justified in killing someone in self-defense."  The court also gave CALCRIM No. 571, which defined voluntary manslaughter based on imperfect self-defense.

As to the assault with a firearm counts, the trial court gave CALCRIM No. 875, which set forth the elements of the offense.  The instruction included the optional element that appellant "did not act in self-defense."  However, the trial court did not give CALCRIM No. 3470, which defines the legal standard for lawful self-defense for nonhomicide offenses.[7]

CALCRIM No. 3470 and CALCRIM No. 505 both articulate the standard for lawful self-defense but differ as to "the type of the threat the defendant believed they

---

[6]   Because we conclude the trial court did not commit instructional error, we need not address appellant's claim he was prejudiced by the instruction.

[7]   Defense counsel did not request the trial court give this instruction.

20.

faced." (*People v. Waxlax* (2021) 72 Cal.App.5th 579, 591.) To justify a homicide, which involves the use of deadly force, the defendant must have believed they were "in imminent danger of being killed or suffering great bodily injury." (CALCRIM No. 505, see *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) To justify a lesser use of force, such as an assault, the defendant must only have feared that any bodily injury or unlawful touching was imminent. (CALCRIM No. 3470; see *People v. Minifie* (1996) 13 Cal.4th 1055, 1064.) Both instructions specify that regardless of the type of force employed, the defendant must have "used no more force than was reasonably necessary to defend against that danger." (CALCRIM Nos. 505, 3470, see *People v. Minifie,* at p. 1065.)

### B. *Standard of review.*

When self-defense is raised as a defense to assault charges, the prosecution must prove beyond a reasonable doubt the defendant did not act in self-defense, just as it must prove any other element of the crime. (CALCRIM No. 875, see *People v. Lee* (2005) 131 Cal.App.4th 1413, 1429.) Instructional errors that misdescribe an element of an offense or are incomplete and misleading are subject to the prejudice standard set forth in *Chapman.* (*People v. Schuller* (2023) 15 Cal.5th 237, 251.) Under this standard, reversal is required unless the reviewing court can conclude beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman, supra*, 386 U.S. at p. 24.)

### C. *Any presumed error was harmless.*

Appellant contends substantial evidence supported CALCRIM No. 3470, and its erroneous omission allowed the jury to convict him of the assault counts without considering whether he acted in lawful self-defense. Even assuming appellant is correct, the error was harmless. Based on the jury's findings and our review of the record, we conclude the absence of CALCRIM No. 3470 could not have contributed to the verdicts rendered.

Appellant did not testify that he pointed the firearm at Isabel and Senior in self-defense. He only claimed he acted in self-defense when he shot Junior. He denied pointing the firearm at anyone else in the bedroom and did not recall encountering Senior and Isabel in the hallway. In other words, according to appellant, the assaults never happened. Consistent with this testimony, defense counsel argued to the jury that appellant was not guilty of the assault with a firearm charges because the assaults did not occur. Thus, a finding that appellant committed the assaults in self-defense would have been inconsistent with appellant's testimony and the defense theory as to those counts.

We also observe the jury rejected appellant's claim that he acted in perfect or imperfect self-defense when he shot Junior. Imperfect self-defense requires an actual but unreasonable belief that deadly force was necessary to defend against the imminent threat of great bodily injury or death. (*People v. Rios* (2000) 23 Cal.4th 450, 461; see *In re Christian S.* (1994) 7 Cal.4th 768, 771; CALCRIM No. 571.) Additionally, as the jury was instructed, imperfect self-defense is inapplicable if "the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force." (CALCRIM No. 571, see *In re Christian S.,* p. 773, fn. 1.) Therefore, the jury necessarily found appellant did not actually believe in the need for self-defense, or that his own wrongful conduct (i.e. drawing a firearm during a verbal argument) created circumstances under which Junior was justified in responding in self-defense.

The jury's rejection of imperfect self-defense is significant to our prejudice analysis because the murder and the assaults were part of the same confrontation. According to appellant's testimony, he feared for his safety not just because of Junior's actions, but due to the allegedly aggressive conduct of his fellow assailants. As defense counsel argued to the jury, lethal force was necessary because appellant was "trapped" in the bedroom. The jury rejected this, finding appellant either did not actually believe lethal force was necessary, or that he forfeited his right to self-defense through his own wrongful conduct.

22.

The prosecution evidence established appellant pointed the firearm at Isabel and Senior immediately before firing the fatal shot, and again after Isabel and Senior retreated into the hallway. Under any reasonable interpretation of the evidence, Isabel and Senior did not present any more of a threat to appellant than Junior. Given the jury's finding that appellant did not act in even imperfect self-defense when he shot Junior, we fail to see how the jury could have separately found that, moments before and after the shooting, appellant actually and reasonably believed pointing the firearm at Senior and Isabel was necessary to defend against imminent danger of bodily injury.

As appellant observes, self-defense was the "central disputed issue" in this case. The issue was thoroughly litigated at trial, and the jury rejected it. Based on this finding and our review of the evidence, we are convinced beyond a reasonable doubt the guilty verdicts rendered in the trial were unattributable to the omission of CALCRIM No. 3470. (See *Sullivan v. Louisiana, supra,* 508 U.S. at p. 279.) Accordingly, the alleged instructional error was harmless, and this claim lacks merit.

**IV.  The Trial Court Did Not Err in Failing to Instruct the Jury on a Prohibited Possessor's Right to Temporarily Possess a Firearm in Lawful Self-defense. (CALCRIM No. 2514.)**

Appellant asserts the trial court was obligated to instruct the jury he was not guilty of being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 4) if he only temporarily possessed the firearm for purposes of self-defense. (See CALCRIM No. 2514.) We conclude the instruction was not supported by substantial evidence.

**A.  *Background.***

Appellant stipulated he was previously convicted of a felony and prohibited from possessing a firearm pursuant to section 29800, subdivision (a)(1). The trial court instructed the jury with CALCRIM No. 2511 (Possession of Firearm by Person Prohibited Due to Conviction—Stipulation to Conviction). Defense counsel did not request the trial court give CALCRIM No. 2514 or otherwise object.

23.

**B.     *Standard of review.***

"A trial court is required to instruct sua sponte on any defense, including self-defense, only when there is substantial evidence supporting the defense, and the defendant is either relying on the defense or the defense is not inconsistent with the defendant's theory of the case." (*People v. Villanueva* (2008) 169 Cal.App.4th 41, 49; see *People v. Breverman* (1998) 19 Cal.4th 142, 157, disapproved of on another ground by *People v. Schuller, supra,* 15 Cal.5th at p. 260, fn. 7.) We review claims of instructional error de novo. (*People v. Cole*, *supra*, 33 Cal.4th at p. 1210.)

**C.     *CALCRIM No. 2514 was not supported by substantial evidence.***

A person who is statutorily prohibited from possessing a firearm may do so for purposes of self-defense, but only under narrowly circumscribed conditions. (*People v. King* (1978) 22 Cal.3d 12, 24 (*King*).) In *King*, our high court explained that in enacting former section 12021, the predecessor to section 29800, the Legislature did not intend to deny prohibited possessors from using a firearm in self-defense in emergency situations. (*King,* at p. 15.) Thus, a prohibited person may possess a firearm for purposes of self-defense, but only under the following conditions: 1) the person reasonably believed he or she was in immediate danger of great bodily injury; 2) the immediate use of force was necessary to defend against that danger; 3) the firearm became available to the person without predesign or planning; 4) the possession was no longer than necessary to defend against the danger; 5) no other means of avoiding the danger were available; and 6) the use was reasonable under the circumstances. (*Id.* at p. 24.) CALCRIM No. 2514 explains that if the above conditions are met, the defendant is not guilty of unlawful possession of a firearm.

The facts in *King* illustrate the narrowness of this exception. The defendant was a guest at a birthday party. (*King, supra, 22* Cal.3d at p. 16.) A fight broke out and several party crashers attempted to break down the front door and smashed a window. (*Id.* at pp. 17–18.) A woman gave the defendant a firearm from her purse, and he fired it into

the air to frighten the intruders.  (*Id.* at p. 18.)  The defendant was charged with, inter alia, possession of a concealable firearm by a felon (former § 12021).  (*King,* at pp. 19–20.) *King* held that under these circumstances it was error not to instruct the jury the defendant was not guilty if he only temporarily possessed the firearm for purposes of self-defense.  (*Id.* at pp. 26–27.)

Here, unlike in *King*, the evidence conclusively established appellant did not temporarily possess the firearm without predesign or planning. Appellant described the firearm as "my pistol" and kept it secreted between his mattresses while he was sleeping. He knew he was prohibited from owning or possessing a firearm but acquired it for "protection" because he "lived in a bad area."  In other words, he kept the firearm for general defense to respond to potential future threats.  It was available during the conflict with Isabel and her family because he had acquired it in advance.

*People v. McClindon* is instructive.  (*People v. McClindon* (1980) 114 Cal.App.3d 336.)  There, the defendant, a felon, was awakened by noise outside of his bedroom window.  (*Id.* at p. 339.)  He picked up a pistol that he kept on his nightstand, pulled up the curtain, and fired three shots.  (*Ibid.*)  At trial, the defendant admitted he kept the firearm by his bed for protection.  (*Ibid.*)  *McClindon* rejected the defendant's claim he was entitled to an instruction on temporary possession of a firearm for self-defense, reasoning his "possession of the pistol was admittedly not brief and further it was not without design or prior possession."  (*Id.* at p. 340.)

The evidence in the instant case is nearly identical to *McClindon*.  Appellant admitted he obtained the firearm well in advance of the shooting for general self-defense. There was no evidence possession was temporary or without predesign or planning.

Accordingly, we conclude CALCRIM No. 2514 was not supported by substantial evidence, and instructional error did not occur.[8]

## V. The Trial Court Did Not Err in Failing to Give an Unanimity Instruction.

In supplemental briefing, appellant contends the trial court erred in failing to give an unanimity instruction as to the assault with a firearm counts (§ 245, subd. (a)(2); counts 2 and 3) and the felon in possession of a firearm count (§ 29800, subd. (a)(1); count 4). (See CALCRIM No. 3500.) We conclude no such instruction was required.

### A. *Applicable law – jury unanimity.*

In a criminal case, a jury verdict must be unanimous. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16; *People v. Anzalone* (2013) 56 Cal.4th 545, 555.) In addition, "the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.]" (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "[W]hen violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty. [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 679.) Under these circumstances, absent election by the prosecution, an unanimity instruction must be given sua sponte. (*People v. Riel* (2000) 22 Cal.4th 1153, 1199.) The purpose of this requirement is " 'to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' " (*People v. Russo,* at p. 1132.)

### B. *The assault with a firearm charges did not warrant an unanimity instruction because the prosecution made a clear election.*

Appellant argues an unanimity instruction was required for counts 2 and 3 because there was evidence of two separate assaults. As we explained above, the prosecution

---

[8] Because we conclude CALCRIM No. 2514 was not supported by the evidence, we need not address appellant's claim he was prejudiced by its absence.

evidence established appellant pointed the firearm at Isabel and Senior in the bedroom immediately before firing the fatal shot, and again once they had retreated into the hallway. Appellant suggests that, absent an unanimity instruction, the jury could have convicted appellant of the assaults without unanimously agreeing on the specific assaultive act.

We conclude no unanimity instruction was required because the prosecutor elected to rely solely on the assault in the hallway to prove the assault charges. "The prosecution can make an election by 'tying each specific count to specific criminal acts elicited from the victims' testimony'—typically in opening statement and/or closing argument. [Citation.]" (*People v. Brown* (2017) 11 Cal.App.5th 332, 341; see e.g. *People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1455 [prosecutor made an effective election by repeatedly asserting in argument the facts that formed the basis for the count]; *People v. Jantz* (2006) 137 Cal.App.4th 1283, 1292 [prosecutor informed the jury in argument that the criminal threats charge was based on a specific threat described by a specific witness]; *People v. Diaz* (1987) 195 Cal.App.3d 1375, 1382 [prosecutor tied each count to specific criminal acts].) "[T]here is an implicit presumption that the jury will rely on the prosecution's election and, indeed, is bound by it." (*People v. Brown,* at p. 341.) Thus, where the prosecution makes an election, an unanimity instruction is not required. (*Ibid.)*

The record shows the prosecutor informed the jury of its election in clear and direct terms. During closing argument, the prosecutor stated that counts 2 and 3 pertain "to what happened in the hallway." While addressing the evidence supporting these counts, she only discussed Isabel's testimony that appellant pointed a gun at her and Senior "in the hallway." Anticipating defense counsel's response, the prosecutor urged the jury to credit Isabel's allegation despite her prior inconsistent statements regarding the hallway assault. Moreover, the prosecutor never argued or suggested the jury should find appellant guilty of counts 2 and 3 based on his assaultive conduct in the bedroom.

27.

Appellant notes the prosecutor also mentioned Isabel's testimony that appellant pointed the firearm at her and Senior in the bedroom. However, she only did so while addressing the evidence supporting the murder count. She explained that Isabel testified appellant pointed the firearm at her immediately before Junior "dove in front of the bullet." Given the context, it was clear the prosecutor was discussing this testimony to support her theory that appellant intended to kill Isabel but unintentionally killed Junior. She never suggested appellant's conduct in the bedroom, rather than the hallway, supported the assault charges. In short, nothing in the prosecutor's discussion of the evidence supporting the murder charge undermined the clarity of her election on the assault charges.

Appellant's reliance on *People v. Melhado* is unavailing. (*People v. Melhado* (1998) 60 Cal.App.4th 1529.) There, the defendant was charged with a single count of making criminal threats (§ 422) for threatening employees at an auto repair shop. (*Melhado,* at p. 1532.) The evidence established the defendant went to the shop twice in one day, and each time threatened to blow up the shop with a hand grenade. (*Id.* at p. 1533.) On appeal, *Melhado* held an unanimity instruction was required and rejected the respondent's claim that the prosecution made an election during closing argument. (*Id.* at p. 1539.) It reasoned that while the prosecution placed more emphasis on one event than others, it did not adequately inform the jury that it had elected to seek a conviction based solely on that event. (*Id.* at p. 1536.)

Here, the prosecutor did not merely emphasize one act over another. Unlike in *Melhado,* the prosecutor expressly told the jury that the charges in question were based on a specific act – appellant pointing his firearm at Isabel and Senior *in the hallway*. This was a clear statement of election. We therefore conclude the trial court did not err in failing to give an unanimity instruction on counts 2 and 3, and this claim is without merit.

**C.** ***The being a felon in possession of a firearm charge did not warrant an unanimity instruction because there was only evidence of a single act of possession.***

Appellant also contends an unanimity instruction was required for count 4, claiming the evidence showed two discrete acts of possession: acquisition of the firearm prior to the shooting for general defense, and use of the firearm during the confrontation with Junior. This distinction is not supported by the record. Appellant admitted he acquired the firearm before the shooting for general defense and described it as "my pistol." On the morning of the shooting, he kept the firearm secreted between his mattresses while he was sleeping alone in the bedroom. When he drew the firearm from his bed to use during the confrontation, it was already in his possession.

Contrary to appellant's claim, there was no evidence of "distinct possessions separated by time and space." (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 574.) Rather, the evidence conclusively established appellant retained continuous possession of the firearm. An unanimity instruction is warranted "if there is evidence that more than one crime occurred, each of which could provide the basis for conviction under a single count." (*People v. Grimes* (2016) 1 Cal.5th 698, 727.) Because the evidence showed only a single continuous act of unlawful possession, an unanimity instruction was not required. Accordingly, we conclude no instructional error occurred, and we reject this claim.[9]

## VI. Appellant Fails to Show Defense Counsel was Ineffective for Failing to Object to Various Arguments Made by the Prosecutor.

Appellant contends defense counsel should have objected to several alleged instances of prosecutorial misconduct during closing argument. We conclude the record does not support his ineffective assistance of counsel claims.

---

[9] Because we conclude unanimity instructions were unwarranted, we need not address appellant's claims that he was prejudiced by the alleged errors.

## A. *Standard of review.*

Prosecutorial misconduct occurs when " '[a] prosecutor … uses deceptive or reprehensible methods to persuade the jury.' " (*People v. Parson* (2008) 44 Cal.4th 332, 359.) "When a claim of misconduct is based on the prosecutor's comments before the jury … ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.)

"To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument. [Citation.]" (*People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at p. 305.) Appellant concedes defense counsel did not object to the alleged acts of misconduct. Thus, we must determine whether the failure to object rises to the level of ineffective assistance of counsel.

To prevail on an ineffective assistance of counsel claim, the claimant must establish counsel's performance fell below an objective standard of reasonableness, and that prejudice occurred as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688.) "Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Jennings* (1991) 53 Cal.3d 334, 357.) The defendant has the burden of showing both deficient performance and resulting prejudice. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)

## B. *Appellant was not prejudiced by defense counsel's failure to object to the prosecutor's statements regarding the legal standard for heat of passion voluntary manslaughter.*

While explaining the concept of heat of passion voluntary manslaughter, the prosecutor gave the example of a person discovering his or her spouse in bed with

another person, and "they can't control themselves and they lose all matter of being able to comprehend how to act properly and they take a gun and they shoot the person that's having this affair." The prosecutor then stated:

> "But it has to be a reasonable response to a situation. So, Ladies and Gentlemen, is it a reasonable response that when somebody – your wife comes home and says they are leaving you and is moving out that you take out a gun and you shoot that person? Would that be a reasonable way to respond? Or would maybe another response be to push him out of the room, or to shut the door … the laws in the State of California do not allow somebody to take out a gun and then use deadly force and shoot that person."

Appellant contends this was a misstatement of the law. He notes the correct legal standard for heat of passion is whether provocation was sufficient to induce a reasonable person of average disposition to " 'act rashly without due deliberation and reflection,' " not whether it would cause such a person to kill. (*People v. Beltran* (2013) 56 Cal.4th 935, 939, 942.) He analogizes the instant case to *People v. Najera*, which held the prosecutor misstated the law by suggesting the proper standard for heat of passion was whether "a reasonable person [would] do what the defendant did." (*People v. Najera* (2006) 138 Cal.App.4th 212, 223, italics omitted (*Najera*).)

Respondent concedes the prosecutor's comments "approached the improper argument in *Najera*," but argues appellant was not prejudiced by defense counsel's failure to object. We agree. In assessing prejudice, we consider the prosecutor's remarks " '[i]n the context of the whole argument and the instructions.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667.) Immediately after the prosecutor made the above comments, she urged the jury to review the applicable standard for heat of passion "because that is not what was going on here." The prosecutor then articulated the correct standard for heat of passion: "Defendant was provoked, as a result, the Defendant acted [rashly] and under the influence of intense emotion and obscured his reasoning or judgment, and the provocation would have caused a person of average disposition to act rashly and without

31.

due deliberation that is from passion rather than judgment." This statement was consistent with the trial court's instruction on heat of passion voluntary manslaughter with CALCRIM No. 570, which is a correct statement of law. The jury was also instructed with CALCRIM No. 200 that it must follow the trial court's instructions even if they conflict with the attorney's comments. We presume the jury understood and followed the trial court's instructions. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852; *People v. Boyette* (2002) 29 Cal.4th 381, 436.) Thus, to the extent the prosecutor's comments were misleading, the prejudicial effect was minimal.

Further, contrary to appellant's claim, he did not rely on a heat of passion defense at trial. Appellant denied becoming angry when Isabel said she was leaving him. He never claimed he acted under the influence of intense emotion that obscured his judgement. (See CALCRIM No. 570, see *People v. Beltran, supra,* 56 Cal.4th at pp. 938–939.) Consistent with appellant's testimony, defense counsel did not mention heat of passion during closing argument. She focused exclusively on perfect and imperfect self-defense and asked the jury to find appellant not guilty of murder on those bases. Given the lack of evidence of heat of passion and appellant's reliance on a different theory, there is no basis to conclude the prosecutor's comments resulted in prejudice.

Defendant nonetheless maintains the jury could have found he acted in the heat of passion based on his testimony he was in fear and panicking during the confrontation with Junior. But as we explained above, in rejecting imperfect self-defense, the jury found appellant did not actually believe lethal force was necessary to defend himself, or that his own wrongful conduct justified Junior responding in self-defense. Given these findings, the jury could not have also reasonably concluded appellant was in such a state of fear and panic that he acted rashly and without due deliberation, regardless of the prosecutor's comments.

Considering the jury's findings, the lack of evidence supporting heat of passion, and the limited significance of the prosecutor's comments, there is no reasonable probability defense counsel's failure to object contributed to the verdict. Accordingly, appellant did not suffer prejudice, and this claim fails.

**C.** ***The prosecutor did not suggest appellant had no right to self-defense under any circumstance or a duty to retreat. Defense counsel was not ineffective for failing to object.***

As noted above, during closing argument, the prosecutor remarked that instead of shooting his firearm, appellant could have pushed his alleged assailants "out of the room" or "shut the door." Later, while addressing appellant's self-defense claim in rebuttal, the prosecutor stated:

> "The Defendant is the one that pulled out the gun. The Defendant is the one that put himself in this situation, which goes to whether this was lawful self-defense. It was not, Ladies and Gentlemen. This is the morning time, broad daylight or morning. This is not like four men that he's never met before break into his house and take his stuff…. So again, what is appropriate? What was the appropriate thing to do? He only had a gun. Well, you know what, Ladies and Gentlemen, he didn't have a right to bring that gun out. Nobody charged him, okay. He had his fists. He had a way to shut the door."

Appellant contends the prosecutor erroneously suggested he had no right to use a firearm under any circumstance and a duty to retreat before exercising his right to lawful self-defense. We are not persuaded. The prosecutor's remarks highlighted the evidence supporting her position that appellant's self-defense claim was not reasonable. She explained that appellant was the first and only person to draw a weapon, and he did so in response to no more than a verbal argument with his then wife and in-laws. Her statement that appellant "didn't have a right to bring that gun out" did not imply that appellant had no general right to defend himself, regardless of the nature of the threat faced. Rather, it was an observation that appellant drew his firearm even though he was not facing any imminent threat. This was a fair comment on the evidence and was

33.

relevant to whether appellant's subsequent discharge of the firearm was an act of lawful self-defense.

Similarly, the prosecutor's argument that appellant had alternatives to lethal force did not imply he was legally obligated to retreat. Her suggestion that appellant could have shut the door or pushed everyone out of the bedroom highlighted the unreasonableness of appellant's self-defense claim. As the prosecutor argued, appellant was not facing any imminent threat of great bodily injury or death. It follows that the reasonable course of action would have been to use nonlethal force or no force at all. The prosecutor never suggested appellant was required to retreat from the threat of deadly force. Her point was that appellant never faced such a threat, and thus, the use of deadly force was not reasonable.

In short, the prosecutor did not misstate the law or otherwise mislead the jury. Her remarks fell within the wide latitude afforded prosecutors to vigorously argue their case and make fair comment upon the evidence. (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.) Because we conclude the prosecutor's remarks were not objectionable, appellant fails to show defense counsel was ineffective for failing to object.

### D. *The prosecutor did not commit misconduct by arguing that appellant's testimony was not truthful. Defense counsel was not ineffective for failing to object.*

Appellant claims the prosecutor committed misconduct by asserting at various points in closing argument that appellant's testimony was not truthful. Most notably, while addressing appellant's self-defense claim, the prosecutor made the following statement:

> "[Y]ou have to believe everything the Defendant was saying to buy that argument. This is why it's glaringly clear that the Defendant was not being truthful. His own witness, Felix Ordonez, who was really asleep on the couch, not in the room at the time, didn't see anything, but then when the Defendant took the stand he said that Felix came in and he was putting [Senior] in a chokehold, okay. Well, if that were true don't you think Felix

34.

would have said that here in court?  But he didn't.  Don't believe what the Defendant told you, Ladies and Gentlemen, because he is lying.  He is not being truthful.  He has a prior conviction for a felony, and he has a motive to lie here, okay.  His story is completely different than the other individuals that were there, completely different from … Henson, completely different from Isabel, and completely different from [Senior]."

Later, during rebuttal, the prosecutor argued:  "And now [four] years later he comes in here and he makes up a story claiming that it's self-defense.  A story that's 180 degrees different than any of the other witnesses that testified about what happened."

We conclude the prosecutor's remarks were not improper.  "Referring to the testimony … of a defendant as 'lies' is an acceptable practice so long as the prosecutor argues inferences based on evidence rather than the prosecutor's personal belief resulting from personal experience or from evidence outside the record.  [Citation.]"  (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1030.)  "[H]arsh and colorful attacks on the credibility of opposing witnesses are permissible" so long as they are reasonably warranted by the evidence.  (*People v. Arias* (1996) 13 Cal.4th 92, 162, italics omitted; see *People v. Sandoval* (1992) 4 Cal.4th 155, 180.)

The prosecutor's argument that appellant's self-defense testimony lacked veracity had support in the record.  She was careful to note that appellant's testimony differed greatly from the testimony and statements of other witnesses.  She also relied on appellant's prior felony conviction, which was introduced by stipulation.  (See Evid. Code, § 788 [felony conviction admissible for impeachment).  Lastly, the prosecutor suggested appellant had a motive to lie, presumably based on his interest in the outcome of the trial.  Such argument was permissible, particularly given the clear inconsistences between appellant's testimony and the evidence.  (See *People v. Bunyard* (1988) 45 Cal.3d 1189, 1222, abrogated on another ground by *People v. Diaz* (2015) 60 Cal.4th 1176, 1191; Evid. Code, § 780, subd. (f); CALCRIM No. 226.)

Appellant also claims the prosecutor improperly suggested his defense was fabricated *by defense counsel*.  This assertion is not supported by the record.  The

prosecutor's remarks were clearly directed at appellant, not his representation. Nothing the prosecutor said could be construed as an attack on the integrity of defense counsel.

The prosecutor's argument that appellant's testimony was not truthful was fair comment on the evidence and not objectionable. We therefore conclude appellant fails to show defense counsel was ineffective for failing to object, and we reject this claim.

## VII. Cumulative Error.

Appellant raises a claim of cumulative error. He contends that, based on the totality of some of the errors identified above, he suffered a fundamentally unfair trial. We disagree.

"Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) A claim of cumulative error is essentially a due process claim. (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) The test is whether the defendant received a fair trial. (*Ibid*.)

We reject appellant's claim of cumulative error because we have denied all his individual claims. (See *People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [cumulative prejudice argument rejected because each individual contention lacked merit or did not result in prejudice].) Taking all of appellant's claims into account, we are satisfied that he received a fair adjudication.

## VIII. Appellant's Challenge to the Trial Court's Victim Restitution Order is Forfeited. Defense Counsel Was Not Ineffective for Failing to Object.

The trial court ordered appellant to pay $3,807 in restitution to the California Victim's Compensation Board (CVCB) based on a claim from A.H. Appellant claims the order should be stricken because there was insufficient evidence the claimant was a victim of his crimes. We conclude the claim is forfeited because defense counsel did not object to the restitution order, and we reject appellant's corresponding ineffective assistance of counsel claim.

36.

**A.  *Background.***

The probation report included a "Restitution Request" from the CVCB stating it had paid A.H. $3,807 for her claim for "Mental Health Expenses," and requesting the court order appellant to pay restitution in the same amount to the CVCB.  At the sentencing hearing, the trial court ordered appellant pay $3,807 in restitution to the CVCB.  Appellant did not object or request a hearing to dispute the restitution order. (See § 1202.4, subd. (f)(1).)

**B.  *Applicable law – direct restitution and the CVCB.***

Under the California Constitution, a crime victim is entitled to restitution.  (Cal. Const., art. I, § 28(b)(13).)  Section 1202.4, which governs victim restitution, requires the court to order restitution "in every case in which a victim has suffered economic loss as a result of the defendant's conduct."  (§ 1202.4, subd. (f).)  The term "victim" is defined to include, as pertinent here, persons who sustained economic loss as a result of the crime and were the actual victim's "spouse" or were "living in the household of the victim." (§ 1202.4, subd. (k)(3).)  Economic loss includes "[m]ental health counseling expenses." (*Id*., subd. (f)(3)(c).)

The CVCB pays claims to victims from California's Restitution Fund.  (Govt. Code, § 13950, subd. (b); see *People v. Brown* (2007) 147 Cal.App.4th 1213, 1221, fn. 4.) "[W]hen direct victim restitution has been satisfied by the victim's application to the [CVCB], the amounts a defendant is ordered to pay as direct victim restitution are instead paid to the Restitution Fund."  (*People v. Holman* (2013) 214 Cal.App.4th 1438, 1452; see § 1202.4, subd. (f)(2).)

**C.  *The claim is forfeited.***

Respondent contends appellant forfeited his challenge to the restitution order by failing to object below.  We agree.  "A defendant wishing to argue on appeal that there is no factual basis for a restitution order must object on that ground in the trial court to preserve the issue for appeal."  (*People v. Mays* (2017) 15 Cal.App.5th 1232, 1237.)

Accordingly, we conclude that by failing to object, appellant "forfeited any claim that the order was … unwarranted by the evidence." (*People v. Brasure* (2008) 42 Cal.4th 1037, 1075.)

### D. *Appellant's ineffective assistance of counsel claim is meritless because the record indicates the victim was entitled to restitution.*

Appellant argues that if this court finds the issue is forfeited, the restitution order should still be reversed because its imposition was attributable to ineffective assistance of counsel. He asserts the record does not show "who [A.H.] is," and thus, there was insufficient evidence she was a victim of appellant's crimes.

This assertion does not comport with the record. A.H. was not an unknown party. The record plainly shows that A.H. is Henson's sister, and that she was in a dating relationship with Junior. Throughout the trial, witnesses referred to A.H. as either Junior's wife or his girlfriend. During his law enforcement statement, Henson explained that A.H. and Junior were "married, but not fully married." Thus, the record suggests A.H. was Junior's spouse and/or cohabitant.

Any ambiguity as to whether A.H. was a "victim" under section 1202.4 was clarified by the CVCB's payment of benefits. Under the CVCB's eligibility statutes, compensation for those who were not the actual victim of the crime is limited to the same categories of persons as direct restitution. (Gov. Code, § 13955, subd. (c).) This includes the actual victim's spouse, or a person who lived in the same household as the actual victim. (*Id*., § 13955, subds. (c)(1), (c)(2).) Therefore, A.H.'s eligibility for CVCB benefits indicates she was a "victim" within the meaning of section 1202.4. (See § 1202.4, subd. (k)(3).)

Based on this record, there is no reason to believe the restitution order was unwarranted. Accordingly, appellant fails to meet his burden of showing that but for defense counsel's failure to object, it is reasonably probable the restitution order would

not have issued.  (See *People v. Jennings, supra,* 53 Cal.3d. at p. 357.)  The ineffective assistance of counsel claim fails.

**IX.** **Appellant's Claim That the Trial Court Should Have Dismissed His Firearm Enhancement Pursuant to Section 1385, Subdivision (c)(2)(C), is Forfeited. Defense Counsel Was Not Ineffective for Failing to Request Dismissal on This Ground Because the Subdivision is Inapplicable.**

In supplemental briefing, appellant claims the trial court erred by failing to dismiss his firearm enhancement (§ 12022.53, subd. (d)) at sentencing pursuant to section 1385, subdivision (c)(2).  Specifically, he argues the trial court should have dismissed the firearm enhancement pursuant to subdivision (c)(2)(C), which applies where "[t]he application of an enhancement could result in a sentence of over 20 years."

We agree with respondent that the claim is forfeited because appellant did not request the trial court dismiss the enhancement.  We also reject appellant's ineffective assistance of counsel claim because section 1385, subdivision (c)(2)(C) is inapplicable to appellant's sentence.

### A.     *Background.*

The trial court sentenced appellant to 95 years to life in state prison as follows. On count 1, the court sentenced appellant to 15 years to life, tripled based on appellant's prior strike convictions, for a term of 45 years to life.  (§ 667, subd. (e)(2)(A)(i).)  As to the section 12025.53, subdivision (d) firearm enhancement on count 1, the trial court imposed an additional term of 25 years to life.  On count 2, the trial court sentenced appellant to 25 years to life based on his prior strike convictions (§ 667, subd. (e)(2)(A)(ii)), to be served consecutively to count 1.  Sentences on counts 3 and 4 were ordered to run concurrently.

Prior to sentencing, defense counsel requested the trial court dismiss one or both of appellant's prior strike conviction findings pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.  The trial court denied the request based on appellant's

"significant criminal history." Defense counsel did not request the trial court dismiss the use of a firearm enhancement.[10]

## B. *Applicable Law – section 1385, subdivision (c).*

Effective January 1, 2022, Senate Bill No. 81 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1) amended section 1385 to add subdivision (c), which provides, in part:

> "(1)  Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.
>
> "(2)  In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the [listed] mitigating circumstances ... are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."  (§ 1385, subd. (c)(1)–(2).)

Appellant relies on the following enumerated mitigating circumstance listed in section 1385, subdivision (c)(2)(C): "The application of an enhancement could result in a sentence of over 20 years.  In this instance, the enhancement shall be dismissed."

## C. *The claim is forfeited.*

Under section 1385, a criminal defendant has "the right to 'invite the court to exercise its power by an application to strike a count or allegation of an accusatory pleading.' " (*People v. Carmony* (2004) 33 Cal.4th 367, 375.)  However, "complaints

---

[10]     While pronouncing judgment the firearm enhancement, without prompting from counsel, the trial court stated:  "The Court acknowledges [that due to] the recent changes in the law, as well as decisions from the higher courts, the Court may have some ability to modify or strike that enhancement[.]  I choose not to do so.  I think it would be completely and wholly inappropriate to do so in this case.  That enhancement is 25 years to life."  It appears this was a refence to the trial court's discretion to strike or modify a firearm enhancement pursuant to sections 1385, subdivision (a) and 12022.53, subdivision (h).  (See *People v. Tirado* (2022) 12 Cal.5th 688, 692; *People v. McDavid* (2024) 15 Cal.5th 1015, 1020.)

about the manner in which the trial court exercises its sentencing discretion … cannot be raised for the first time on appeal." (*People v. Scott* (1994) 9 Cal.4th 331, 356.) Thus, "any failure on the part of a defendant to invite the court to dismiss under section 1385 … forfeits [the] right to raise the issue on appeal." (*People v. Carmony,* at p. 374; see *People v. Coleman* (2024) 98 Cal.App.5th 709, 724 [defendant forfeited his claim the trial court was required to dismiss enhancements pursuant to section 1385, subdivision (c)(2) by failing to request dismissal below].)

Appellant did not request the trial court dismiss the firearm enhancement. As a result, the trial court had no occasion to exercise its discretion in accordance with section 1385, subdivision (c)(2). Accordingly, the claim is forfeited.

**D.**      ***Defense counsel was not ineffective because section 1385, subdivision (c)(2)(C) does not apply to appellant's sentence.***

Appellant argues that even if the claim is forfeited, he is still entitled to relief because he suffered ineffective assistance of counsel. He contends that section 1385, subdivision (c)(2)(C) necessarily requires dismissal of the firearm enhancement because his sentence exceeded 20 years.

Appellant's broad reading of section 1385, subdivision (c)(2)(C) does not comport with its plain language. " 'When interpreting statutes, we begin with the plain, commonsense meaning of the language used by the legislature. [Citation.] If the language is unambiguous, the plain meaning controls.' [Citation.] '[W]henever possible, significance must be given to every word [in a statute] in pursuing the legislative purpose[.]' " (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1131.)

Section 1385, subdivision (c)(2)(C) states an enhancement shall be dismissed if its application "could *result* in a sentence of over 20 years." (Italics added.) The verb "result" means "[t]o be a physical, logical, or legal consequence." (Black's Law Dict. (12th ed. 2024) p. 1576, col. 1.) Thus, the subdivision only applies when, as a consequence of the enhancement, the sentence is (or could be) over 20 years. (See

Couzens et al., Sentencing Cal. Crimes (The Rutter Group 2024) § 12:11 ["There will be no entitlement to relief unless it is the application of the term for the enhancement that results in a sentence of longer than 20 years"].) Conversely, section 1385, subdivision (c)(2)(C) does not apply where a defendant's sentence is greater than 20 years before the enhancement is applied, because the sentence does not exceed 20 years *as a result* of the enhancement.

Here, appellant was sentenced to 45 years to life on count 1 alone. The trial court also imposed a consecutive sentence of 25 years to life on count 2. Even without the additional term of 25 years to life from the firearm enhancement, appellant's sentence was already well in excess of 20 years. Accordingly, section 1385, subdivision (c)(2)(C) does not apply. We therefore conclude appellant fails to show defense counsel was ineffective for failing to request dismissal of the enhancement on this ground, because the request would have been futile. (See *People v. Thompson* (2010) 49 Cal.4th 79, 122.) Likewise, appellant fails to demonstrate he was prejudiced by counsel's allegedly deficient performance. The ineffective assistance of counsel claim is without merit.

## DISPOSITION

The judgment is affirmed.

LEVY, Acting P. J.

WE CONCUR:

MEEHAN, J.

DE SANTOS, J.

42.